IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

TAKEI MCFARLAND                                                                                    PLAINTIFF

V.                                                                          NO. 4:14-CV-00090-DMB-JMV

STANLEY BROOKS, et al.                                                                          DEFENDANTS

## ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

On June 23, 2014, Plaintiff Takei McFarland filed a pro se complaint,[1] alleging a variety of constitutional claims, including violations of the Eighth Amendment. Doc. #1. After a *Spears* hearing, all claims except those against Defendants Stanley Brooks, Ed Cole, Henry Gipson, and Richard Gipson[2] were dismissed. Doc. #13. Defendants Brooks, Cole, Henry,[3] and Richard have moved for summary judgment. Doc. #23. For the reasons that follow, the motion for summary judgment will be granted in part and denied in part.

## I
## Summary Judgment Standard

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). In order to grant summary judgment, the Court "must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to

---

[1] R. Shane McLaughlin entered an appearance as counsel for McFarland on June 3, 2015. Doc. #32.

[2] The parties occasionally spell the surname of Henry Gipson and Richard Gipson as "Gibson;" however, the majority of the record indicates it spelled as "Gipson." The Court will follow the spelling used in the record.

[3] Defendants Henry Gipson and Richard Gipson will be referred to by only their first names at times to avoid any confusion.

return a verdict in h[is] favor." *Id*. at 411–12. To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id*. at 412.

When the nonmoving party bears the burden of proof at trial, "the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). If the moving party succeeds in this demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191–92 (5th Cir. 2011) (internal punctuation omitted). When reviewing a motion for summary judgment, the Court must "resolve factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## II
## Relevant Facts

### A. Worksite

At the time he filed his pro se complaint, Takei McFarland was an inmate at the Mississippi State Penitentiary in Parchman, Mississippi. Doc. #1 at 1; Doc. #41-1 at ¶ 2. While incarcerated, McFarland was assigned to work at the prison's poultry farming facility. Doc. #41-1 at ¶ 2; Doc. #41-2 at 1. The poultry facility site includes four structures, a layer house, and three retrofitted hog houses in which chickens are kept. Doc. #41-5 at 1. As of January 2014,

the facility could house up to 44,000 birds. *Id*. at 3. At that time, eggs were collected from the site and served in prisons across Mississippi. *Id*.

McFarland worked at the poultry facility from October 6, 2013, until April 9, 2014.[4] Doc. #1[5] at 4; Doc. #41-2 at 4.

### B. Supervisors

Defendant Stanley Brooks has worked for the Mississippi Department of Corrections ("MDOC") as the Director of Agricultural Enterprise and Statewide Food Services for twelve years. Doc. #41-6 at 5. Brooks supervises "the total farm operation," including the poultry facility. *Id*. at 5, 7.

Defendant Ed Cole works as a farm manager and is "responsible for the day-to-day operations of the poultry farm." Doc. #41-7 at 6. Cole reports directly to Brooks. Doc. #41-6 at 7. Cole estimates that he has been in the position of farm manager since December 2013. Doc. #41-7 at 6.

---

[4] Henry testified that McFarland was assigned work outside of the chicken houses after he complained of the work conditions but did not say when such occurred. Doc. #43-1 at 35–36.

[5] "On summary judgment, factual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit." *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003). Under 28 U.S.C. § 1746, verification requires the "writing of such person which is subscribed by him, as true under penalty of perjury, and dated." The writing must be substantially in the form of "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date)." 28 U.S.C. § 1746(2). "The Fifth Circuit has found that a verification under 28 U.S.C. § 1746 need not explicitly track the language of the statute, but must at least contain statements that the unsworn statement is made 'under penalty of perjury' and verified as 'true and correct.'" *Lackey v. SDT Waste & Debris Servs.*, No. CIV.A. 11-1087, 2013 WL 5772325, at *16 (E.D. La. Oct. 23, 2013) (quoting *Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988). A verification that however "allows the affiant to circumvent the penalties for perjury in signing onto intentional falsehoods," does not conform to the statute's requirements. *Nissho–Iwai Am. Corp.*, 845 F.2d at 1306.

At the end of his complaint, McFarland "declare[d] under the penalty of perjury that all statements made herein are true and correct." Doc. #1 at 28. McFarland signed beneath the declaration and included the date on the same page. *Id*. Accordingly, in evaluating Defendants' motion for summary judgment, the Court will consider the allegations in McFarland's verified complaint as if they were contained in an affidavit. *See, e.g., Stewart v. Guzman*, 555 F. App'x 425, 431–32 (5th Cir. 2014) (facts alleged in complaint considered where party "attached a signed declaration to his complaint, stating that, 'under the penalty of perjury,' the facts alleged in his complaint were 'true and correct'").

Defendant Henry Gipson works as a Supervisor of Inmates and oversees the inmate workers at the poultry facility. Doc. #41-3 at 7–8. Henry reports directly to Ed Cole, and shares "authority over the day-to-day operations of the chicken farm" with Cole. Doc. #41-6 at 7; Doc. #41-3 at 27.

Defendant Richard Gipson is a Fire and Safety Director with the Mississippi State Penitentiary Fire Department. Doc. #41-4 at 1. Richard conducted at least six inspections of the poultry facility between October 2013 and May 2014. *Id*. at 1–11.

### C. Conditions at the Poultry Facility

Between 2012 and 2013, the number of workers assigned to the poultry facility dropped from fifty-two to nineteen. Doc. #41-5 at 3. According to Brooks, there was not enough labor to properly maintain the facility. Doc. #41-6 at 13.

On January 15, 2014, Doctor Tom Tabler and Doctor Morgan Farnell, Poultry Specialists with the Mississippi State University Extension Service, visited the site in order to "evaluate the birds and facilities and to make recommendations for improvement." Doc. #41-5 at 1. They recorded their observations in their "Parchman Prison Site Visit Report." *Id*.

Tabler and Farnell observed that, at the time of their visit, the buildings were in disrepair. Doc. #45-1 at 1. Specifically, they noted that there were holes in the roofs, unsealed soffits, torn curtains, missing insulation due to a rodent infestation, and holes in the walls up to a foot wide. *Id*. at 1–2. Combined with the lack of an operational heating system, the disrepair exposed the birds to the elements. *Id*. The Report noted that roughly "20% of the birds appeared [to] have died recently (within the week), likely from hypothermia" and that water lines had ruptured from the freezing temperatures. *Id*. at 1. Tabler and Farnell also observed the remains of birds that had died much earlier. *Id*.

The Report described the lighting system as in "poor repair." Doc. #45-1 at 1. The lights in the buildings "were not serviceable in many locations and some were hanging from their wiring." *Id*. Overall, the electrical system "seemed to be in bad repair with a corroded breaker box and exposed wiring throughout." *Id*.

The Report additionally noted that "[t]he floors were covered with approximately 2 ft of liquid manure and spilled feed. There were many live and dead birds within this fecal slurry." Doc. #45-1 at 1. Tabler and Farnell observed that there was "very little slope from the barns to the lagoons" and that, combined with possible backpressure from the lagoons, which were full, the lack of slope would make draining the buildings more difficult. *Id*. They opined that, with warmer temperatures, "[t]he manure-feed-carcass slurry is an ideal substitute for fly production." *Id*. at 2. There was no way to control or manage ventilation at the time of their visit. *Id*.

According to the Report, despite the conditions, "[w]orkers were observed feeding and caring for the birds as best able, but were exposed to dangerous and extremely difficult working conditions such as unsure footing, open drains, undoubtedly a significant bacterial load, insects in warmer weather, [and] exposed wiring." Doc. #45-1 at 2. The Report included a plan to salvage the three retrofitted hog houses; the original layer house was deemed unsalvageable.[6] *Id*.

The Report further criticized the slope of the chicken cages, the frequency of egg collection, and the feeding practices. *Id.* at 1, 2. In their depositions, Brooks, Cole, and Henry disagreed with a small selection of the findings in the Report.[7] Docs. #41-6 at 10–11; #41-7 at 13–15; #43-1 at 17–19. They confirmed, however, that most of the reported conditions existed.

---

[6] In addition to their observations about the state of the facility, Tabler and Farnell commented that "[i]f the flock were owned by private industry[,] it would already have been shut down by regulatory agencies for safety violations" and "[w]hen one considers the impacts to animal welfare, food safety, human safety and the environment[,] the facility is a disaster." Doc. #45-1 at 3.

[7] As areas where he believed the Report was incorrect, Brooks identified the depth of the manure present, the slope from the barns to the lagoon, the quality of the lighting system, the extent to which whole kernels were present in the

5

### D. McFarland's Work Conditions and Injuries

In an unsworn declaration,[8] McFarland states that, in order to feed the chickens, he had to wade through at least a foot and a half of chicken feces which had accumulated over the five months he had worked there, and that he was once almost electrocuted by a live wire hanging down into the manure. Doc. #1 at 30, 32. McFarland worked in the chicken feces without a mask or gloves. Doc. #1-1 at 38. He explains that when he freed live chickens from the slurry, the chickens would flap their wings, which caused fecal matter to land on his face and lips. Doc. #1 at 39.

McFarland declares that the fumes burned his eyes and lungs and the manure mixture overflowed into his boots, burned his legs, and caused him to lose his leg hair. Doc. #1 at 36. McFarland testified by affidavit that he developed "a serious rash." Doc. #41-1 at ¶ 5. He additionally declares that he was not provided with clean clothes and that the washing machine and dryer on site were broken. Doc. #1 at 33, 36.

McFarland states that there was "no proper heating system in [the] sitting area or [the] chicken houses" and that, during the winter months, temperatures dropped into the negatives. Doc. #1 at 6, 17. He declares that the cold temperatures and wind experienced between

---

chicken feed, and the egg collection practices. Doc. #41-6 at 10–11. Brooks testified that the rodent infestation was "not that serious. Doc. #43-2 at 22. Cole disagreed with the reported depth of the manure, the slope from the barns to the lagoon, the quality of the lighting system, and the characterization of the feeding and egg gathering practices. Doc. #41-7 at 13–15. He testified that inmates hiding contraband in the insulation contributed to its removal. *Id.* Henry testified that "probably 90%" of the observations contained in the site visit report were correct but disagreed with the observations about the slope of the cages and the egg collections practices. Doc. #43-1 at 17–19.

[8] McFarland's description of his work conditions and their effect on him are indicated in his multiple unsworn declarations and his verified complaint. Facts contained in unsworn declarations declared true under the penalty of perjury may be relied upon at the summary judgment stage. *See, e.g., Stewart*, 555 F. App'x at 431–32. McFarland submitted a number of unsworn declarations along with his verified complaint. One declaration dated January 15, 2016, describes the MSU site visit. Doc. #1-1 at 38–40. Another dated March 5, 2014, elaborates on the conditions in which the chickens were kept. Doc. #1 at 29–32. A declaration dated March 9, 2014, details the conditions McFarland encountered at the poultry facility. *Id.* at 33–41. A final declaration dated April 7, 2016, describes the disposal of the dead chickens. Doc. #1-1 at 43–44. Each declaration is signed and declares under the penalty of perjury that each statement is true and correct. Doc. #1 at 32, 41; Doc. #1-1 at 40, 44. The Court, therefore, considers the facts in McFarland's unsworn declarations as well. *See Nissho-Iwai Am. Corp*, 845 F.2d at 1306.

November 2013 and February 2014 made it difficult to work and breathe. *Id*. at 30. McFarland claims that he was not provided protective clothing or gloves and that, when it was cold, Cole and Henry sat in their truck with the heat on while the inmates worked. *Id.* at 17, 34. Cole testified that there had "never been really any heating systems out there" and that "it was a hard winter." Doc. #41-6 at 14.

In hotter weather, McFarland was surrounded by flies and maggots. Doc. #1 at 6. McFarland saw rats and poisonous spiders in the prisoners' clothing and boots, as well as gnats at the site. *Id.* at 37, 21.

Additionally, McFarland asserts that he stepped in a manure-covered hole on March 11, 2014, and injured his back. *Id.* at 6. He first sought treatment for the injury on March 13, 2014, and again on April 13, 2014, and May 31, 2014. *Id.* at 6; Doc. #1-1 at 16, 50.

### III
### Procedural History

On June 23, 2014, McFarland filed his pro se complaint, alleging a variety of constitutional claims, including violations of the Eighth Amendment. Doc. #1. After being initially set for September 23, 2014, a *Spears* hearing was held December 17, 2014. That day, United States Magistrate Judge A. Allan Alexander issued a Report and Recommendation ("R&R") dismissing all but McFarland's Eighth Amendment claims against Brooks, Cole, Henry, and Richard. Doc. #13. This Court adopted the R&R February 9, 2015. Doc. #18.

In what remains of his complaint, McFarland claims that Brooks, Cole, Henry, and Richard violated his Eighth Amendment rights by exposing him to unsafe and unsanitary conditions at the poultry facility. Doc. #1 at 6. Specifically, McFarland claims that, while working at the poultry facility: (1) he worked in a slurry of manure and rotting chicken carcasses that was two to three feet deep without protective clothing, equipment, or ventilation; (2) he

7

worked around exposed wiring and corroded break boxes without protection; (3) the work site contained unsure footing and open drains, which the manure obscured, and he was injured after stepping into a hole; (4) he was exposed to flies, gnats, maggots, spiders, and rodents; (5) he was exposed to below freezing temperatures without heating or proper clothing; (6) he ate his lunch in these conditions because nowhere else was provided; and (7) the eggs collected in these conditions continued to be served to the prisoners, including him. *Id*. at 5–9, 13, 16–22. McFarland requests compensatory, declaratory, and punitive damages in this case. *Id.* at 25–26, 28.

Defendants Brooks, Cole, Henry, and Richard moved for summary judgment on May 18, 2015. Doc. #23. McFarland filed a response to the motion on September 21, 2015, in which he conceded the dismissal of claims against Richard. Doc. #42 at 10. On September 24, 2015, Brooks, Cole, and Henry[9] replied. Doc. #43.

# IV
# Analysis

In their summary judgment motion, Defendants argue that they are entitled to sovereign immunity as to the claims against them in their official capacity, that they are entitled to qualified immunity as defendants in their individual capacities, and that McFarland has failed to state a cognizable claim against them.

### A. Claims Against Richard Gipson

As mentioned above, in his response to summary judgment, McFarland concedes summary judgment as to Richard Gipson. Doc. #42 at 10. Accordingly, summary judgment will be granted regarding those claims, and Richard Gipson will be dismissed from this lawsuit. *See*

---

[9] Their reply states that "[i]nasmuch as Plaintiff concedes the motion for summary judgment as it applies to Richard Gibson [sic], Richard Gibson does not participate in this Rebuttal." Doc. #43 at 1.

*Santiero v. Denny's Rest. Store,* 786 F. Supp. 2d 1228, 1232 (S.D. Tex. 2011) (granting summary judgment and dismissing defendant where plaintiff conceded claims against him).

### B. Sovereign Immunity

Defendants argue that they are entitled to sovereign immunity as to "all claims against them in their official capacities" because "MDOC is an arm of the state, its officers and employees are, in fact, officers and employees of the state, and are likewise entitled to sovereign immunity from monetary damages in their official capacity." Doc. #24 at 4, 5. In his response, McFarland argues that there is no Eleventh Amendment issue because the "Report and Recommendation following the *Spears* hearing in this case recommended dismissal of all claims other than the claims against Stanley Brooks, Ed Cole, Henry Gibson and Richard Gibson in their individual capacities." Doc. #42 at 9. He further specifies that "[t]he only remaining claims in this case are individual capacity claims against the individual Defendants." *Id.* at 10. Brooks, Cole, and Henry do not address the issue of sovereign immunity in their reply. Doc. #43.

McFarland's complaint purports to sue the defendants only in their individual capacities.[10] *See* Doc. #1 at 1. In the R&R, the Court "determine[d] that McFarland stated an Eighth Amendment claim against defendants Stanley Brooks, Ed Cole, Henry Gipson, and Richard Gipson, as he [had] alleged that each had a personal involvement in the wrongs alleged in his complaint." Doc. #13 at 4. Accordingly, it is clear that the only claims currently before the Court are Eighth Amendment claims brought against Brooks, Cole, and Henry in their individual capacities. Thus, the motion for summary judgment on the non-existent official capacity claims will be denied as moot.

---

[10] The complaint lists the defendants in their individual and official capacities; however, the "official" capacity designations are stricken. *See* Doc. #1 at 1.

## C. Qualified Immunity

While a plaintiff may seek monetary damages from government officials who have violated his constitutional rights, the officials may invoke the defense of qualified immunity. *Camreta v. Greene*, 131 S. Ct. 2020, 2030–31 (2011). The defense of qualified immunity is not available to all government employees but rather "can only be claimed by those officials whose positions require the exercise of official discretion." *Williams v. Treen*, 671 F.2d 892, 896 (5th Cir. 1982). In granting qualified immunity, "a district court must find that the defendant official[']s position required the exercise of discretion and that his allegedly tortious conduct was undertaken within the scope of his discretionary authority." *Id.* at 897. "Since qualified immunity is a defense, the burden of pleading it rests with the defendant." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Accordingly, the defense is "only available to those government officials who affirmatively assert the defense and who prove that they were acting within the scope of their discretionary authority." *Creamer v. Porter*, 754 F.2d 1311, 1317 (5th Cir. 1985). *See Cronen v. Tex. Dep't of Human Servs.*, 977 F.2d 934, 939 (5th Cir. 1992) ("defendant must both plead and establish his entitlement to the defense").

Establishing that a defendant acted within the scope of his discretionary authority as a public official requires

> more than a bald assertion by the defendant that the complained-of actions were undertaken pursuant to the performance of his duties and within the scope of his discretionary authority; there must be a showing by competent summary judgment materials of objective circumstances that would compel that conclusion.

*Barker v. Norman*, 651 F.2d 1107, 1124–25 (5th Cir. 1981). *See also Williams*, 671 F.2d at 897 (exercise of discretion and discretionary authority "involve questions of fact which must be determined through the use of appropriate fact-finding procedures; i.e. summary judgment proceedings or an evidentiary hearing"). However, once a defendant has asserted qualified

immunity and has established that his conduct was undertaken pursuant to the exercise of his discretionary authority, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *Saldana v. Garza*, 684 F.2d 1159, 1163 (5th Cir. 1982).

"[T]he showing that a defendant official must make to avail himself of the qualified immunity defense varies depending upon the degree of discretion that he exercises in performing his official duties." *Douthit v. Jones*, 619 F.2d 527, 534 (5th Cir. 1980). Discretion requires the performance of nonministerial acts, which often involve the exercise of judgment. *Tamez v. Cty. of San Marcos, Tex.*, 118 F.3d 1085, 1091–92 (5th Cir. 1997); *Cronen*, 977 F.2d at 939. An official defendant "whose discretion is limited," such as a police officer, "must demonstrate that he acted with a good faith belief that his actions were within his lawful authority, and that reasonable grounds existed for this belief based upon objective circumstances at the time he acted," while "an official such as a prison administrator, who must exercise an exceedingly broad range of discretion in performing his official duties, … should be entitled to qualified immunity upon a showing that he acted within the scope of his discretionary authority." *Douthit*, 619 F.2d at 534. *See Cruz v. Beto*, 603 F.2d 1178, 1184 (5th Cir. 1979) ("Officials responsible for prison administration have a broad range of duties and authority and must be able to react quickly and authoritatively to everyday occurrences. Their responsibilities are far broader and require greater exercises of discretion than police officers.").

Courts have continued to observe distinctions in pleading requirements based on the amount of discretion exercised by the defendant. The Fifth Circuit and district courts within it continue to require that a defendant police officer bear "the burden of pleading his good faith and establishing that he was acting within the scope of his discretionary authority when the allegedly

wrongful acts occurred."[11] *Saldana*, 684 F.2d at 1163 (arrest of plaintiff by police officers). *See Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) (use of deadly force by police officer); *Callis v. Sellars*, 931 F. Supp. 504, 517 (S.D. Tex. 1996) (claim by plaintiff of sexual assault and harassment by police officer). Courts also have applied the same requirements to defendants such as narcotics agents. *See West v. U.S. Dep't of Justice*, No. CIV. A. 97-2520, 1997 WL 878774, at *8 (E.D. La. Apr. 28, 1997) (search of plaintiff's bag by narcotics agents).

Meanwhile, "[e]xecutive officials who must necessarily exercise discretion in the scope of their duties" are required to "show that the conduct in question occurred while [they were] acting 'in [their] official capacity and within the scope of [their] discretionary authority'" in order to establish that they are entitled to qualified immunity. *Cronen*, 977 F.2d at 939 (quoting *Garris v. Rowland*, 678 F.2d 1264, 1271 (5th Cir. 1982)) (defendants made decisions about food stamp eligibility). *See Beltran v. Cty. of El Paso*, 367 F.3d 299, 303 (5th Cir. 2004) (defendant was emergency operator); *Piazza's Seafood World, LLC v. Odom*, No. CIV.A. 07-413-JJB, 2011 WL 6012998, at *1 (M.D. La. Dec. 1, 2011) (defendant was "acting as Commissioner of Agriculture and Forestry for the State of Louisiana").

In their answer[12] to McFarland's complaint, Defendants claim that their "actions were at all times in compliance with, and in furtherance of compelling state interests, proper correctional

---

[11] Some courts, however, have more recently required that defendants with more discretion than police officers both plead good faith and establish that they were acting "acting within the scope of his discretionary authority." *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992) (applying standard to county sheriff responding to hostage situation); *Vinzant v. Smith*, No. 1:14-CV-00147, 2015 WL 9673883, at *3 (W.D. La. Sept. 17, 2015) (requiring correctional officers in prison plead good faith and establish they were acting within scope of authority).

[12] While some courts have held that defendants may plead qualified immunity in their answers, the Fifth Circuit has held that the defense must be urged or argued; a defendant simply stating in his answer that he is immune from suit is insufficient. *Compare Harris v. Canulette*, No. CIV. A. 91-2578, 1992 WL 245626, at *4 (E.D. La. Sept. 16, 1992), *aff'd*, 997 F.2d 881 (5th Cir. 1993), and *Callis*, 931 F. Supp. at 518, *with Martin v. McElvaney*, No. 92-2103, 1994 WL 442440, at *5 (5th Cir. 1994).

procedures and done in good faith," and that they were "entitled to and hereby affirmatively plead their federal law qualified immunity to suit and liability in this cause." Doc. #17 at 2. The affirmative defense of qualified immunity, however, "is not automatically available to every 1983 defendant merely by virtue of his status as a government employee"; Defendants must demonstrate that their "positions required the exercise of official discretion, and that they have acted within the scope of that discretion." *Williams*, 671 F.2d at 896–97. The mere statement that a defendant acted in good faith does not establish entitlement to the defense. *McGee v. Carrillo*, 297 F. App'x 319, 321–22 (5th Cir. 2008) (citing *Douthit*, 619 F.2d at 536). *See Jones v. Lopez,* 262 F. Supp. 2d 701, 717 (W.D. Tex. 2001) ("mere statement that [defendants] believed in good faith that their actions were lawful will not suffice to establish the defense; they must present objective evidence").

In moving for summary judgment, Defendants argue that "[a]s officials of the Mississippi Department of Corrections whose positions involve the exercise of discretion, Defendants are immune from suits brought against them in their individual capacities pursuant to the doctrine of qualified immunity." Doc. #24 at 6. While Defendants do not indicate how much discretion they exercised in performing their official duties, the record elsewhere indicates that Brooks, Cole, and Henry were in supervisory positions, and made both long term and day-to-day decisions involving the operation of the poultry facility. *See* Doc. #41-3 at 3; Doc. #41-6 at 2; Doc. #41-7 at 2–3. Such positions involve the broad exercise of discretion. *See Cruz*, 603 F.2d at 1184; *Douthit*, 619 F.2d at 534–35. Although the Fifth Circuit imposes a lesser burden on officials who exercise a wider range of discretion, they are still required to show that they acted within the scope of that discretionary authority. *Douthit*, 619 F. 2d at 534.

Brooks and Henry submitted affidavits in support of the motion for summary judgment. Doc. #23-1; Doc. #23-2. However, neither affidavit addresses the scope of their discretionary authority or whether the actions about which McFarland complains were undertaken in their official capacity. *Cf. Woods v. Keiffer*, 610 F. App'x 416, 416 (5th Cir. 2015) (per curiam) ("[defendant] properly supported his summary judgment motion with an affidavit establishing 'that he was acting within the scope of his discretionary authority'" which then "shifted the summary judgment burden to [plaintiff]"). Nor have Defendants submitted other evidence in support of their motion for summary judgment or pointed to evidence elsewhere in the record that would establish their entitlement to the defense. *Owens v. Stalder*, No. CV08-0768-A, 2009 WL 4405794, at *5–6 (W.D. La. Dec. 2, 2009) (where defendant "has not submitted any summary judgment evidence, such as affidavits or other evidence as required by law, to prove he is entitled to qualified immunity," he "has not carried his burden" and is not entitled to summary judgment). Because Defendants have not proved that their positions "entailed the exercise of discretionary authority and that [they] acted within the scope of that authority," the Court cannot find that they are entitled to qualified immunity. *Williams,* 671 F.2d at 897 (district court erred in not "first developing the factual record necessary to support a finding that each of these defendants were entitled to a qualified immunity").

In similar cases where defendants have failed to properly satisfy their initial qualified immunity burden, courts in other districts have denied motions for summary judgment without prejudice. *See, e.g., Moore v. Felger*, No. CIV. A. 92-0367, 1992 WL 124827, at *3 (E.D. La. June 2, 1992) (motion dismissed without prejudice where court concluded "that defendants have not established at this time that they are entitled to … summary judgment on the basis of qualified immunity"); *Adegbuji v. Abode*, No. CIV.A03-CV-4537(JLL), 2005 WL 3536073, at

*4–5 (D.N.J. Dec. 22, 2005) (motion denied without prejudice where defendants did "not adequately brief the issue of whether they are entitled to qualified immunity"). Accordingly, while Defendants have failed to meet their burden in asserting the qualified immunity defense in this motion, the Court does not foreclose the possibility of Defendants establishing that they acted in their official capacity and within the scope of their discretionary authority. *See Wood v. Pesanti*, No. 3:03 CV 1960 TPS, 2005 WL 3307276, at *6 (D. Conn. Dec. 6, 2005) (despite failure to properly assert qualified immunity "the court does not foreclose the possibility that [defendant] may someday prevail on this defense, either by renewed motion or at trial"). Therefore, the Court will deny the motion for summary judgment on the grounds of qualified immunity without prejudice to Defendants.[13] *See Rainey v. Herrera*, No. C.A. C-06-097, 2006 WL 3694509, at *1 (S.D. Tex. Dec. 14, 2006) (where defendants did not properly support their motion, it was "respectfully recommended that defendants['] motion for summary judgment be denied without prejudice to defendants filing a supplemental motion for summary judgment motion").

### D. Cognizable Claims

Defendants briefly argue in their summary judgment motion that McFarland has failed to state a cognizable claim, in part because he has not "shown any injury or illness resulting from the actions or inactions of the Defendants." Doc. #24 at 11. In his response to the summary judgment motion, McFarland argues that "he was subjected to an 'undoubtedly … significant bacterial load'" and "had nightmares from the dead, decomposing and maggot-infested chicken carcasses to which he was continuously shown." Doc. #42 at 8. In their reply, Brooks, Cole, and Henry elaborate further, stating that the Prison Litigation Reform Act ("PLRA") requires a prior

---

[13] Given that the motions deadline has passed, Defendants may pursue their qualified immunity defense only at trial.

showing of physical injury before a prisoner may bring a civil action for mental or emotional injury suffered while in custody, and claiming that McFarland only identifies a rash and nightmares as the effects of his exposure to the conditions at the facility. Doc. #43 at 4. Brooks, Cole, and Henry argue that McFarland has not produced any evidence of a rash and that, even if he had, a rash would be a *de minimis* injury and insufficient to support his claims. *Id.* at 4–5. "Without a documented physical injury," they argue, McFarland cannot recover damages for his alleged emotional injuries and his claims should be dismissed. *Id.*

Because McFarland filed his complaint pursuant to 42 U.S.C. § 1983, it is subject to the PLRA. *See Anderson v. Jackson Cty.*, No. 1:10-CV-00213-JMR, 2011 WL 2491349, at *3 (S.D. Miss. June 22, 2011). The PLRA states, in relevant part:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).

42 U.S.C. § 1997e(e). The "physical injury required by § 1997e(e) must be more than *de minimis* but need not be significant." *Alexander v. Tippah Cty., Miss.*, 351 F.3d 626, 631 (5th Cir. 2003) (internal punctuation and citations omitted).

"A physical injury is an observable or diagnosable medical condition requiring treatment by a medical care professional. It is not a sore muscle, an aching back, a scratch, an abrasion, a bruise, etc., which lasts even up to two or three weeks." *Luong v. Hatt*, 979 F. Supp. 481, 486 (N.D. Tex. 1997). "Injuries for which free world individuals would not seek emergency room or other professional medical care are not significant." *Purtell v. Corr. Corp. of Am.*, No. CIVA 2:05CV192 MPMJA, 2007 WL 1464376, at *2 (N.D. Miss. Mar. 26, 2007) (citing *Luong*, 979 F. Supp. at 486). Injuries which "normal people treat with 'over-the-counter drugs, heating pads, rest, etc., do not fall within the parameters of 1997e(e).'" *Whitney v. Taylor*, No. 2:05CV110-

16

WAP-JAD, 2007 WL 2254348, at *4 (N.D. Miss. July 13, 2007) (quoting *Luong*, 979 F. Supp. at 486).

Defendants are correct that a claim for compensatory damages is barred by the PLRA if no physical injury is alleged. *Jones v. Greniger,* 188 F.3d 322, 326 (5th Cir. 1999). However, in this case, McFarland claims that he injured his back on March 11, 2014, while stepping in a hole hidden by manure at the poultry facility, and that he sought treatment on March 13, 2014.[14] Doc. #1 at 6. The record indicates that, in a letter to Superintendent Lee dated April 13, 2014, McFarland requested a "medical trip for [his] back injury." Doc. #1-1 at 16. On May 31, 2014, McFarland submitted a medical service request form because "[his] back continue[d] to hurt after stepping in that unseen hole at livestock." *Id.* at 50. The record indicates that he was seen by medical personnel sometime in early June. *Id.*

An "aching back," even one lasting a couple of weeks, for which "free world individuals" would not seek medical care is not significant. *Luong*, 979 F. Supp. at 486. Here, however, McFarland maintains that he has scoliosis. Doc. #13 at 2; Doc. #1 at 35. The aggravation of a condition by factors experienced in confinement "may well be the kinds of injuries for which a free world person would seek medical attention." *Skandha v. Savoie*, 811 F. Supp. 2d 535, 539 (D. Mass. 2011). *See Howard v. Klicka,* 242 F. App'x 416, 420 (9th Cir. 2007) (remanding case where district court determined claims of exacerbated back trouble from sleeping on concrete "fell short of meeting the 'physical injury' requirement of the Prison Litigation Reform Act"). Additionally, the record indicates McFarland sought medical treatment for his back injury repeatedly, including two and a half months after the injury occurred. Doc. #1 at 6; Doc. #1-1 at

---

[14] While McFarland also claims that the mixture made him nauseous, nausea is *de minimis*. *Alexander*, 351 F.3d at 631 (vomiting and nausea caused by raw sewerage on floor of cell were *de minimis*). McFarland's rash and the loss of his leg hair also fail to meet the requirements of § 1997e(e). *See Earl v. Dretke*, 177 F. App'x 440, 441 (5th Cir. 2006) (loss of fingernail *de minimis*); *Gins v. J.B. Evans Corr. Ctr.*, No. CIV.A. 08-1475, 2009 WL 196199, at *4 (W.D. La. Jan. 23, 2009) ("nonspecific rash" *de minimis*).

17

16, 50.  Accordingly, there is a genuine question of material fact regarding the injuries McFarland suffered.  *See Skandha*, 811 F. Supp. 2d at 539 (aggravation of spinal fusion and arthritis by cold created "a genuine issue of material fact as to whether [plaintiff] has suffered physical injury").

Furthermore, the PLRA "does not foreclose *claims* where there is no physical injury; it forecloses only *damages* for mental or emotional injury if there is no physical injury." *McCoy v. Newton Cty., Miss.*, No. 3:14CV669-FKB, 2015 WL 4726977, at *2 n.2 (S.D. Miss. Aug. 10, 2015) (citing *Hutchins v. McDaniels,* 512 F.3d 193, 198 (5th Cir. 2007) (emphasis in original)). Requests for nominal damages, injunctive relief, declarations that rights have been violated, and punitive damages are not foreclosed by a failure to show physical injury.  *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999); *Cowan v. Calcote*, No. 3:07-CV-585-DPJ-FKB, 2011 WL 2489914, at *5 n.2 (S.D. Miss. June 21, 2011); *McCoy*, 2015 WL 4726977, at *2 n.2.  In addition to compensatory damages, McFarland requests declarative relief and punitive damages.  Doc. #1 at 25–26, 28.  Even if 42 U.S.C. § 1997e(e) foreclosed recovery of compensatory damages in this case, the Court would still be required to consider whether McFarland was entitled to the other relief he requests.  *See Skandha*, 811 F. Supp. 2d at 539; *McCoy*, 2015 WL 4726977 at *2 n.2 ("while it is doubtful that [plaintiff] could recover anything other than nominal damages, that does not mean that Defendants are entitled to judgment as a matter of law").

# V
## Conclusion

For the reasons above, Defendants' motion for summary judgment [23] is **GRANTED in part and DENIED in part**.  Summary judgment is GRANTED as to McFarland's claims against Richard Gipson.  Summary judgement is DENIED without prejudice as to Defendants' assertion of qualified immunity, and DENIED in all other respects.

**SO ORDERED**, this 21st day of March, 2016.

                                              **/s/ Debra M. Brown**
                                              **UNITED STATES DISTRICT JUDGE**